Filed 7/25/16  Pope v. Broadcast Music CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| VIRGINIA POPE, | B263923 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. Nos. BC430809, BC553094) |
| v. | |
| BROADCAST MUSIC, INC., | |
| Defendant and Respondent. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Mark V. Mooney, Judge.  Affirmed in part, reversed in part, and remanded.

Spillane Trial Group, Jay M. Spillane, for Plaintiff and Appellant Virginia Pope.

Milbank, Tweed, Hadley & McCloy, Linda Dakin-Grimm and Delilah Vinzon, for Defendant and Respondent Broadcast Music, Inc.

Singer-songwriter Sylvester Stewart, aka Sly Stone, and his ex-manager Ken Roberts began this lawsuit as allies but their relationship turned adversarial. They initially filed suit to recover royalties earned by Stewart, and the gist of the breach of contract cause of action against defendant and respondent Broadcast Music, Inc. (BMI) was that BMI delivered the royalty checks to the wrong parties. According to their complaint, BMI should have made the payments to Roberts under the terms of agreements, the validity of which Stewart did not initially contest, purporting to show he had irrevocably assigned Roberts his royalties. Later, however, when Roberts claimed he was entitled to keep any recovered royalties for himself, Stewart made statements suggesting the assignment of his rights to Roberts was invalid. Roberts died while litigation was ongoing, and his successor-in-interest, plaintiff and appellant Virginia Pope (plaintiff), took his breach of contract claim against BMI to trial. The jury found no valid contract existed between Roberts and BMI, and the primary issue we decide is whether reversal is warranted because the jury was not required to treat as conclusively proved certain matters BMI admitted in response to requests for admission.

## I. BACKGROUND[1]

Stewart became well known in the 1960s as the lead performer for the band Sly and the Family Stone. The band played at Woodstock in 1969 and was inducted into the Rock and Roll Hall of Fame in 1993. Stewart was also a prolific songwriter, composing over 300 songs, some of which are still being performed today. (FAC ¶¶ 49-50.)

---

[1] As we explain in greater detail later in this opinion, the only trial involved in this appeal is the trial of plaintiff's causes of action against BMI for recovery of royalties paid to the Goldstein defendants in the four years preceding the filing of this action. In undertaking our analysis of plaintiff's claims of error, we rely on evidence admitted in that trial. To provide context for our analysis, however, we occasionally summarize allegations of the Fourth Amended Complaint, with citations to the applicable paragraph(s).

In 1964, Stewart entered into an affiliation agreement with BMI, a non-profit performing rights organization for publishers and songwriters. For a fee, BMI collected royalty payments from others who used Stewart's songs and distributed those royalties to Stewart. BMI's standard affiliation agreement was for a term of two years and renewed automatically unless terminated by one of the parties.

### A.     Stewart's Relationship with Roberts

Stewart had a substance abuse problem during his performing years, which developed into lifelong drug addiction. (FAC ¶ 52.) By the early 1970s, Stewart was not working professionally, and he faced financial difficulties. Around this time, Roberts became Stewart's personal and professional manager. Roberts advanced money to Stewart and paid some of Stewart's debts. (FAC ¶ 56.)

On January 30, 1976, BMI received a document apparently bearing signatures from Stewart and Roberts (the 1976 Assignment). The document stated Stewart "unconditionally, irrevocably and absolutely assigns to Ken Roberts and/or Ken Roberts Enterprises, Inc. as the Assignee and/or Judgment Creditor of Sylvester Stewart . . . any and all payments . . . to be made by [BMI] to the undersigned Sylvester Stewart pursuant to the terms of the undersigned's existing agreement with BMI . . . ." A BMI representative signed the 1976 Assignment to indicate BMI agreed to comply with it, and BMI began sending Stewart's royalties to Roberts. (FAC ¶ 56.)

In March 1979, Stewart entered into a new affiliation agreement with BMI. In April 1979, BMI received a document dated April 10, 1979 (the 1979 Modification), directing that Stewart's royalties "payable under the March 26, 1979 [affiliation] agreement [with BMI] shall be payable to Majoken, Inc. as successor to Ken Roberts Enterprises, Inc. in accordance with the January 30, 1976 irrevocable assignment thereto." Majoken Inc. was a corporation formed by Roberts in New York in 1975; the name was a combination of the first names of Roberts and his parents. The parties to this

3

action often refer to this corporation as Roberts-Majoken, a usage we adopt in this opinion.

BMI paid Stewart's royalties to Roberts-Majoken for 1979. Then in early 1980, the Internal Revenue Service (IRS) placed a tax levy and lien on Stewart's royalties. BMI accordingly began paying the royalties to the IRS pursuant to the lien.

### B.    Stewart's Relationship with the Goldstein Defendants

In 1989, Stewart entered into an agreement with Gerald Goldstein, Glen Stone, and Stephen Topley by signing an agreement with Even Street, a business entity they controlled (collectively, the Goldstein defendants). Stewart believed the purpose of the agreement was to have the Goldstein defendants manage all of his personal and professional affairs. The terms of the agreement, however, made Stewart an employee of Even Street. The agreement also incorporated a provision that assigned all of Stewart's rights, which on its face would include his rights to royalties from BMI and other sources.

In July 1996, an attorney for Even Street negotiated with the IRS and succeeded in getting the tax lien on Stewart's BMI royalties lifted. At around the same time, the Goldstein defendants created a new entity also called "Majoken, Inc." like Robert's corporation (the parties refer to this entity as Goldstein-Majoken, and we will do the same). (FAC ¶ 93.) In August 1996, the Goldstein defendants sent a letter to BMI instructing it to send Stewart's royalties to "Majoken, Inc." at Even Street's Los Angeles address. BMI complied. (FAC ¶ 95.)

In 2008, the Goldstein defendants stopped paying Stewart any money from his royalties, leaving him destitute. With the help of friends, Stewart investigated his agreements with the Goldstein defendants. In 2009, Stewart notified BMI that there was a dispute about the rights to his royalties. BMI realized there were two Majokens, and stopped distributing Stewart's royalties. This lawsuit ensued. (FAC ¶ 148.)

4

### C. Lawsuit in Case Number BC430809

On January 28, 2010, Stewart and Roberts filed the initial complaint in this action. The complaint asserted claims against 23 defendants, including BMI and the Goldstein defendants. (Opinion in case number B236286 (Opn.) at p. 13.) As relevant here, Stewart and Roberts sought recovery of the royalties BMI paid to Goldstein-Majoken.

BMI filed a cross-complaint against the Goldstein defendants. BMI characterizes the cross-complaint as having been filed in response to the Goldstein defendants' own cross-complaint.[2] Paragraph 12 of BMI's cross-complaint alleges: "In or about January 30, 1976, Stewart assigned his right to receive future royalties from BMI to Roberts and/or Roberts Enterprises in a document entitled 'Irrevocable Assignment of Monies' ('Irrevocable Assignment'), as modified on February 3, 1976. By its terms, the Irrevocable Assignment created an unconditional, irrevocable, and absolute assignment to Roberts and/or Roberts Enterprises of 'any and all payments, by way of advances or otherwise, to be made by Broadcast Music, Inc. to the undersigned Sylvester Stewart. . . , whether attributable to periods prior to or subsequent to' the date of the Irrevocable Assignment. The Irrevocable Assignment was signed by Stewart, and agreed to and approved by Roberts. BMI also signed the document for the purpose of memorializing its agreement to comply with the terms of the assignment. A true and correct copy of the Irrevocable Assignment is attached hereto as Exhibit B. In conformity with the terms of the Irrevocable Assignment, BMI ceased making royalty payments directly to Stewart and began making all such royalty payments to Ken Roberts and/or Ken Roberts Enterprises, Inc. ('Roberts Enterprises')."

In the next paragraph of its cross-complaint, BMI alleges Stewart submitted the 1979 Modification to BMI, which directed BMI to make all future payments on his behalf to Majoken, Inc., the successor in interest to Roberts Enterprises. BMI's cross-

---

[2] The record on appeal does not include a copy of the Goldstein defendants' cross-complaint.

complaint stated the 1979 Modification "was signed as 'Agreed And Accepted' by Stewart, Roberts Enterprises, Majoken, Inc. and BMI."

In subsequent paragraphs, BMI noted Stewart disputed the validity of the "purported" 1989 agreements with the Goldstein defendants. BMI described itself as having been "misled and deceived" by the Goldstein defendants. BMI alleged that once it became aware of the royalty dispute between Stewart and the Goldstein defendants in this action, it ceased making payments to the Goldstein defendants. As the cross-complaint observed, "BMI thus finds itself in the anomalous position of being sued by Stewart for breach of contract and conversion precisely because it complied with written instructions from [the Goldstein defendants] to send royalty payments to 'Majoken, Inc.' and, at the same time, BMI is being sued by [the Goldstein defendants] for breach of contract because it complied with written instructions from Stewart and Roberts to cease making said royalty payments to 'Majoken, Inc.'"

Not long after BMI filed its cross-complaint, Stewart and Roberts filed a second amended complaint, and they filed a third amended complaint after that. These early versions of the complaints "acknowledged a side agreement between the plaintiffs that the assigned royalties would not exceed the amount of Roberts' loans to Stewart, and further acknowledged that the loans 'have been repaid.'" (Opn. at p. 23.) This acknowledgement was consistent with a January 7, 2010, declaration Roberts provided to BMI shortly before this action began, stating that he and Roberts-Majoken were owed nothing under the assignment from Stewart. The declaration also stated that the 1976 Assignment had been given to him as security for loans he made to Stewart, but that Stewart no longer owed him or Majoken any money. (Opn. at pp. 12-13.)

In the meantime, in the action Stewart and Roberts filed against BMI (and others), Stewart propounded a First Set of Requests for Admission (RFAs) to BMI. BMI served its responses on February 7, 2011. On March 25, 2011, BMI filed Further Responses to Stewart's RFAs. We will describe these responses in great detail later in this opinion

6

because the question of whether the jury gave them conclusive effect figures prominently in our disposition of this appeal.

After BMI answered Stewart's Requests for Admission, Stewart and Roberts sought and obtained leave to file a Fourth Amended Complaint. The Fourth Amended Complaint contained a number of significant changes from the first three complaints. As relevant here, Stewart asserted only two causes of action against BMI, alleging that BMI breached its contract by failing to provide royalty statements (31st cause of action) and seeking an accounting from BMI (32nd cause of action). Roberts now asserted claims for conversion, breach of a "written agreement," and declaratory relief against BMI. He brought these claims on the theory he was Stewart's assignee under the 1976 Assignment and the 1979 Modification (collectively, the Assignment Documents), alleging that BMI breached those agreements by failing to send Stewart's royalty payments to Roberts or Roberts-Majoken from 1996 to 2009. Roberts alleged the payments were wrongfully made to Goldstein-Majoken and others.

BMI and two other defendants demurred to the Fourth Amended Complaint and the trial court sustained the demurrer without leave to amend. Stewart and Roberts appealed the dismissals that followed the trial court's ruling on the demurrer in case number B236286.

We issued an opinion partially reversing the trial court's judgment. (*Stewart v. First California Bank* (May 30, 2013, B236286) [nonpub. opn.].) We summarized the allegations of the complaint, and since our only task was to determine whether the complaint stated a cause of action, we "'assume[d] that the complaint's properly pleaded material allegations [were] true.'" (Opn. at p. 13.) As relevant here, we held that since Stewart had not challenged the trial court's ruling on his causes of action against BMI, Stewart "apparently conced[ed]" that he lacked standing to sue BMI due to his assignment of rights to Roberts. (Opn. at p. 15.) We upheld the dismissal of those causes of action. (Opn. at p. 29.)

7

Turning to the causes of action asserted by Roberts, we stated there was "no dispute that, in 1976, Stewart 'unconditionally, irrevocably and absolutely' assigned all his BMI royalty rights to '[Roberts].'" (Opn. at p. 22.)  We held that under the language of the Assignment Documents, which were attached as exhibits to the complaint, Roberts had standing to bring breach of contract and declaratory relief actions against BMI, and so the trial court erred in sustaining BMI's demurrer to those two causes of action on standing grounds.  (Opn. at pp. 22-25, 29.)  We held, however, that the statute of limitations confined Roberts's recovery of damages to the four years preceding the filing of the complaint.  (Opn. at p. 25, as modified by our order filed June 27, 2013.)  We rejected BMI's claim that "because earlier versions of the complaint acknowledged a side agreement between [Roberts and Stewart] that the assigned royalties would not exceed the amount of Roberts' loans to Stewart, and further acknowledged that the loans 'have been repaid,' Roberts has no basis for asserting damages."  We explained that "all versions of the complaint are trumped by relevant documents attached to it.  As noted above, the 1976 Assignment from Stewart to Roberts was unconditional, irrevocable and absolute."  (Opn. at p. 23.)

### D. Developments in the Relationship Between Roberts and Stewart

In 2013, after we issued our prior opinion partially reversing the trial court's ruling on the demurrer, Roberts called Arlene Hirschkowitz, a friend of Stewart's who had helped Stewart investigate the loss of his royalties.  According to Hirschkowitz, Roberts told her the BMI royalties were assigned to him, he was going to try to get the royalties for himself, and she should not interfere.  As she would later testify at trial, Hirschkowitz was shocked because this was a complete change from Roberts's previous statements to her, in which he had said that he would help Stewart collect his money.

Later in 2014, Stewart was deposed as a witness in this case.  BMI's attorney showed Stewart a copy of the 1976 Assignment and asked "Why did you sign this document?"  Stewart replied, "I'm not sure to be honest with you."  When asked if he

8

remembered signing the document, he replied, "No." When asked "in 1976, did you have in your mind the idea that you were giving Ken Roberts all of your royalties for the rest of your life for all of the songs and the hits that you had written," Stewart replied, "No." BMI later read into the record at trial these questions and answers from the deposition.[3]

When Roberts died approximately two months later, plaintiff, as Roberts's "life partner" and successor-in-interest, continued to prosecute his claims against BMI.

### E. Plaintiff's Motion in Limine and Trial

The trial court severed plaintiff's cause of action against BMI from the other causes of action in the complaint, and the two sets of claims were tried separately, beginning in September 2014.

Before trial, plaintiff moved in limine to preclude evidence that would, in her view, involve re-litigation of matters already decided by this court or by the trial court on summary judgment. Plaintiff sought to preclude, among other things, testimony by Stewart "regarding his subjective belief that the 1976 [Assignment] and 1979 [Modification] were temporary, despite unambiguous language that the documents effectuated an absolute and irrevocable assignment." She also sought to preclude evidence or argument that the two agreements were "merely security for loans since repaid, including references to superseded pleadings to this effect." Plaintiff argued that "[a]ccording to the Court of Appeal, 'the 1976 Assignment from Stewart to Roberts was unconditional, irrevocable and absolute.'" At the hearing on the motion, the trial court initially stated it was inclined to grant the motion, explaining, "I think based upon not only this court's prior rulings but the Court of Appeal's rulings, there is on its face a valid assignment from Mr. Stewart to Mr. Roberts. So I don't think this trial should be a questioning of that assignment." BMI objected, arguing "[t]he issue here is an

---

[3] At his deposition, BMI showed Stewart a document which referred to the 1979 Modification, but not the Modification itself. Thus, there appears to be no testimony by Stewart about that document.

evidentiary one and so . . . consistent with what the court has said and what other courts [have] said, it is well-settled [that] an assignee cannot recover in the absence of an allegation and proof of the assignment. And so what the issue is here is that the Court of Appeal's decision was on demurrer. There were no factual findings. And what is required from the plaintiff in this trial is competent evidence to establish all of those agreements." In response, the court appeared to backtrack on its previously expressed view, stating "I don't think there's a dispute that [plaintiff's attorneys] have to, in the case in chief, put on evidence there is an assignment." The court later repeated, "I agree they have to show there was an assignment."

Trial commenced soon thereafter, and the evidence plaintiff presented in an effort to establish liability on her breach of contract cause of action consisted of live testimony from plaintiff herself, and excerpts from the deposition testimony of Gary Roth, BMI's person most knowledgeable concerning matters at issue in the lawsuit. Plaintiff also introduced into evidence BMI's allegations in paragraph 12 of its cross-complaint against the Goldstein defendants concerning the 1976 Assignment (quoted above). In addition, plaintiff asked to read to the jury certain of BMI's responses to RFAs propounded by Stewart before he testified at deposition that he had no memory of executing the 1976 Assignment. Specifically, plaintiff sought to read the following RFAs to the jury, each of which BMI admitted:

"Request No. 1: Admit in or about January 30, 1976 Sylvester Stewart assigned his right to receive future royalties from BMI to Ken Roberts . . . AND/OR [Roberts Enterprises, Inc] in a document entitled 'Irrevocable Assignment of Monies' ('IRREVOCABLE ASSIGNMENT') as stated in paragraph 12 of the Cross-Complaint of BMI in Response to the Amended Cross-Complaint filed by [the Goldstein defendants].

"Request No. 2: Admit the IRREVOCABLE ASSIGNMENT by its terms 'created an unconditional, irrevocable, and absolute assignment: to Roberts and/or Roberts Enterprises of "any and all payments, by way of

10

advances or otherwise, to be made by BMI to the undersigned Sylvester Stewart. . . , whether attributable to periods prior to or subsequent to" the date of the IRREVOCABLE ASSIGNMENT,['] as stated in paragraph 12 of YOUR CROSS-COMPLAINT.

"Request No. 3:  Admit the IRREVOCABLE ASSIGNMENT was signed by Sylvester Stewart, as stated in paragraph 12 of YOUR CROSS-COMPLAINT.

"Request No. 5:  Admit the IRREVOCABLE ASSIGNMENT was signed by BMI for the purpose of memorializing its agreement to comply with the terms of the IRREVOCABLE AGREEMENT, as stated in paragraph 12 of YOUR CROSS-COMPLAINT.

"Request No. 6:  Admit after the IRREVOCABLE ASSIGNMENT was signed, 'BMI ceased making royalty payments directly to Stewart and began making all such royalty payments to Ken Roberts and/or Roberts Enterprises,' as stated in paragraph 12 of YOUR CROSS-COMPLAINT.

"Request No. 10:  Admit the APRIL 10, 1979 MODIFICATION was signed 'Agreed and Accepted' by Sylvester Stewart on behalf of Sylvester Stewart, as stated in paragraph 13 of YOUR CROSS-COMPLAINT.

"Request No. 12:  Admit the APRIL 10, 1979 MODIFICATION was signed 'Agreed and Accepted' by BMI, as stated in paragraph 13 of YOUR CROSS-COMPLAINT."

Before plaintiff read the RFA responses, the trial court initially told the jury that if a party admits matters as requested by the opposing party, the jury "must accept them as true, and no further evidence is required to prove them."  But the court then inquired if the RFAs plaintiff wanted to read were propounded from plaintiff to BMI, and the following exchange ensued:

11

**[BMI's Attorney]**:  They [the RFAs] are not, Your Honor.  These were requests for admission for Mr. Stewart as plaintiff in the prior case.  They are not requests for admission from either Mr. Roberts or [plaintiff] to B.M.I. and they were not made in this case.

**The Court**:  So just to be clear, ladies and gentlemen, the matters may be construed only as they apply to the party as if they were admitted that they were true.  So with [this] caveat, they are considered as a statement of the party's opponent and not a matter admitted in this case.

**[ Plaintiff's Attorney]**:  Well, Your Honor, counsel said this was not made in his case.  These [RFAs] were made in this case.  There's no prior case.

**The Court**:  Well, but it has to be between the parties.  It's a subtle distinction, but you are going to be allowed to read them to the jury

Having so advised the jury, the trial court then permitted plaintiff to read BMI's admissions to the above-quoted RFAs.  Plaintiff rested her case-in-chief shortly thereafter.

In its defense, BMI offered Stewart's own deposition testimony about the Assignment Documents, including the excerpts we have already highlighted.  BMI also presented testimony by Hirschkowitz and by attorney Robert Celestin, who initially helped Stewart and Hirschkowitz investigate Stewart's loss of royalties.  In addition, BMI introduced two emails from Roberts to Hirschkowitz and Stewart in which Roberts offered to try to help Stewart in his dispute with Goldstein.  In one of the emails, Roberts wrote:  "Obviously, Jerry Goldstein fraudulently used the assignment given to me by [Stewart] over 20 years ago.  It's very plain and it must be dealt with and I will do it, if [Stewart] wants me to.  [¶]  [Stewart] needs to get his money back and get his future monies."  The trial court instructed the jury on the applicable substantive law before counsel presented their closing arguments.  The court instructed the jury with CACI No. 326, concerning contested assignments, which told the jury plaintiff had the burden to

12

prove Stewart intended to and did transfer his rights to receive royalties from BMI to Roberts. Additionally, and in contrast to the advisement the court gave the jury at the time when plaintiff read BMI's RFA responses (that the responses were merely statements of a party opponent), the court instructed the jury on how it should treat RFA responses using CACI No. 210. The instruction stated: "Before trial, each party has the right to ask another party to admit in writing that certain matters are true. If the other party admits those matters, you must accept them as true. No further evidence is required to prove them." The court, however, also gave CACI 212, which instructed the jury on how it should consider statements of a party opponent.

During closing argument, plaintiff relied on BMI's responses to the RFAs served by Stewart to argue the Assignment Documents were valid contracts between Stewart and Roberts. Plaintiff argued BMI had repeatedly conceded the assignment was valid, pointing to BMI's cross-complaint and RFA responses, plus the deposition of its person most knowledgeable, Gary Roth. BMI countered by emphasizing the court had instructed the jury that plaintiff had to prove that Stewart transferred his rights to Roberts. BMI replayed excerpts of Stewart's recorded deposition testimony in which he claimed he did not think he was giving an irrevocable assignment to Roberts, and BMI extensively argued plaintiff had not proven Stewart intended to assign his rights to Roberts nor ever proved Stewart and Roberts in fact signed the 1976 Assignment. Counsel for BMI acknowledged the company previously believed the assignment was valid, but argued plaintiff's burden was "not to prove what BMI thought. It's to prove that Mr. Stewart transferred his rights intentionally."

In accordance with plaintiff's theory of liability on the breach of contract claim, the first question on the special verdict form given to the jury was: "Did Ken Roberts and Broadcast Music, Inc. BMI, enter into a contract?" By an 11 to 1 vote, the jury

13

answered, "No," which resulted in a verdict fully in BMI's favor. Plaintiff appeals from the judgment entered on the jury's verdict.[4]

### F.    *Plaintiff's Separate Lawsuit*

While litigation in this case was ongoing, plaintiff filed a separate complaint against BMI, seeking recovery of royalties which BMI had paid to Stewart's lawyers beginning in January 2010. We describe this action in greater detail later in this opinion. On March 12, 2015, the trial court sustained BMI's demurrer to that complaint without leave to amend.

## II.  DISCUSSION

Two cases have been consolidated for our consideration. In the appeal from the trial of plaintiff's breach of contract claim in case number BC430809, plaintiff argues the trial court should have treated BMI's allegations in its cross-complaint and its responses to Stewart's RFAs as conclusive evidence that Stewart validly assigned his BMI royalties to Roberts via the Assignment Documents. Plaintiff also appeals from the judgment of dismissal in case number BC553094, which was entered after the trial court sustained BMI's demurrer to the complaint seeking to recover royalties paid from January 2010 forward.

In the first appeal, we hold the trial court should have treated the facts BMI admitted in its RFA responses as conclusively proved. Under established case law, and in light of the special verdict form completed by the jury, the failure to treat the facts as proved requires reversal because we are convinced it seems probable the error prejudicially affected the verdict. Indeed, we could go further and say on this record there is no question the error is prejudicial because the critical evidence relied on by BMI

---

[4]    The validity of the agreement and assignment between Stewart and the Goldstein defendants was separately litigated, and Stewart lost. That case is not before us on appeal.

14

to attempt to contradict the RFA responses was testimony from Stewart that was inadmissible—it contradicted the very facts he asked others to admit by way of his own RFAs. Separately, in the consolidated appeal, we affirm the trial court's judgment dismissing the complaint because it was the product of impermissible claim splitting.

A. *Whether the Trial Court Should Have Given BMI's Admissions Conclusive Effect*

Plaintiff identifies two sources of admissions made by BMI: the assertions made in paragraph 12 of BMI's cross-complaint against the Goldstein defendants and the responses submitted to RFAs propounded by Stewart in connection with the complaint he and Roberts filed against BMI. Plaintiff argues the trial court should have deemed the matters admitted to be conclusively proved, and that argument drives her specific contentions of error, namely, that the trial court wrongly instructed the jury with CACI No. 326, regarding contested assignments, and wrongly denied her new trial motion because the jury's verdict that no contract existed between Roberts and BMI was necessarily unsupported by the evidence and "against law." (Code Civ. Proc., § 657, subd. (6).) On the fundamental question of whether BMI's admissions should have been given conclusive effect, plaintiff is half right, and half right turns out to be enough.

1. *BMI's cross-complaint*

Plaintiff characterizes the allegations by BMI in its cross-complaint against the Goldstein defendants as judicial admissions, which the trial court was required to treat as conclusive evidence of the facts alleged. At trial, plaintiff read paragraphs 12, 13, 14, 20, 21, 23, 24, and 25 of the cross-complaint into the record. As set forth more fully above, BMI alleged in paragraph 12 that Stewart assigned his royalty rights to Roberts via the 1976 Assignment and that the document "was signed by Stewart and agreed to and approved by Roberts" and BMI. Paragraph 13 makes similar allegations about the 1979

15

Modification, alleging the document was signed by Stewart, Roberts, and BMI. Paragraphs 20 through 25 deal with the alleged wrongdoing of the Goldstein defendants.

Case law holds a judicial admission is conclusive only in the particular action in which it is filed. (*Minish v. Hanuman Fellowship* (2013) 214 Cal.App.4th 437, 456 [allegations in pleadings filed in Workers' Compensation Appeals Board proceedings were not binding in current action in superior court]; see also 4 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 453, p. 586.) And our Supreme Court has held a complaint and cross-complaint are treated as separate actions for purposes of analyzing whether statements made therein are binding admissions. (*Shepard & Morgan v. Lee & Daniel, Inc.* (1982) 31 Cal.3d 256, 259-260 (*Shepard*).)

Following the rule in *Shepard*, BMI's cross-complaint against the Goldstein defendants is a separate action from plaintiff's complaint against BMI, which makes all the more sense here where plaintiff and Stewart were not parties to the cross-complaint. Being separate actions, the allegations BMI made in its cross-complaint are not conclusive judicial admissions in this action on plaintiff's complaint. (*Fireman's Fund Ins. Co. v. Davis* (1995) 37 Cal.App.4th 1432, 1440-1441 [allegations in cross-complaint were merely evidence, not conclusive judicial admissions, in action on complaint for declaratory relief].) The trial court did not err when it gave the allegations in BMI's cross-complaint precisely that treatment, namely, a statement by a party opponent that plaintiff could (and did) use to argue her case and that the jury could consider in reaching its verdict. (*Ibid.*)

### 2. *BMI's responses to Stewart's RFAs*

Plaintiff's argument concerning the proper treatment of BMI's responses to Stewart's requests for admissions, however, is not so easily dismissed.

We review the trial court's determination of the legal effect to be given to BMI's responses to Stewart's requests for admission for an abuse of discretion. (*Milton v. Montgomery Ward & Co., Inc.* (1973) 33 Cal.App.3d 133, 138.) "In applying the abuse

16

of discretion standard of review, it is not the role of the appellate court to substitute its own view as to the proper decision. [Citation.] The trial court's discretion, however, 'is not unlimited and must be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. [Citations.]' (*Elston v. City of Turlock* (1985) 38 Cal.3d 227, 233, internal quotation marks omitted.)" (*Parkview Villas Ass'n, Inc. v. State Farm Fire and Cas. Co.* (2005) 133 Cal.App.4th 1197, 1208.) "Under that standard, there is no abuse of discretion requiring reversal if . . . the trial court's decision . . . falls within the permissible range of options set by the applicable legal criteria. [Citations.]" (*Cahill v. San Diego Gas & Elec. Co.* (2011) 194 Cal.App.4th 939, 957.)

Code of Civil Procedure section 2033.010 provides that a party to a civil action may request any other party to the action to admit the truth of specified matters, including "specified matters of fact, opinion relating to fact, or application of law to fact." Code of Civil Procedure section 2033.410, in turn, governs what effect admissions made pursuant to a such a request should be given: "(a) Any matter admitted in response to a request for admission is conclusively established against the party making the admission in the pending action, unless the court has permitted withdrawal or amendment of that admission under Section 2033.300. [¶] (b) Notwithstanding subdivision (a), any admission made by a party under this section is binding only on that party and is made for the purpose of the pending action only. It is not an admission by that party for any other purpose, and it shall not be used in any manner against that party in any other proceeding." (Code Civ. Proc., § 2033.410, subds. (a)-(b).)

On facts similar to those now before us, the First District Court of Appeal held a trial court erred in failing to give conclusive effect to RFA responses made by a subcontractor in a contract dispute. (*Valerio v. Andrew Youngquist Construction* (2002) 103 Cal.App.4th 1264 (*Valerio*).) At the conclusion of the bench trial in that case, the trial judge found there was no valid written contract between the subcontractor, Valerio, and the general contractor. (*Id.* at p. 1267.) The judge so found despite certain RFA

17

responses Valerio had made to the contrary effect (and despite an admission by Valerio in his answer to the complaint). (*Id.* at pp. 1267-1268.) Pointing to the text of the governing Code of Civil Procedure statute, the Court of Appeal explained "[a] matter admitted in response to a request for admission is conclusively established against the party making the admission, unless the court has permitted amendment or withdrawal of the admission." (*Id.* at p. 1272; see also *Murillo v. Superior Court* (2006) 143 Cal.App.4th 730, 736 ["As a general rule an admission is conclusive in the action as to the party making it"].) The Court of Appeal recognized that Valerio believed prior to trial that his admissions were mistaken, but the Court of Appeal nevertheless held Valerio to his admissions, reasoning they were unambiguous and faulting Valerio for failing to amend or withdraw them. (*Valerio*, *supra*, 103 Cal.App.4th at pp. 1273-1274 ["Valerio failed to take the necessary procedural steps to remove his judicial admissions. . . . "].)

Like Valerio, BMI made certain unambiguous admissions that established Stewart signed the Assignment Documents and assigned his royalties to BMI. (*Ante*, at pp. 10-11.) Even if at some point before trial BMI believed its admissions were mistaken, it, like Valerio, failed to move to amend or withdraw its responses. (*Valerio*, *supra*, 103 Cal.App.4th at p. 1273 [counsel, who "labored under the "'misconception . . . that there was in place a fully executed written agreement between the parties'" was required to seek relief under former section 2033, subd. (f)(1)(B), now section 2033.300]; see also Code Civ. Proc., §§ 2033.410, subd. (a), 2033.300, subd. (b).) Thus, BMI was bound by its admissions concerning the assignment between Stewart and Roberts.

The trial court's decision to instruct the jury with CACI No. 326, however, demonstrates it did not hold BMI to these admissions. As given by the court without modification (except tailoring to the facts of this case) CACI No. 326—entitled "Assignment Contested"—informed the jury: "Ken Roberts was not a party to any Affiliation Agreement between BMI and Mr. Stewart. However, [plaintiff] may bring a claim for breach of the contract if she proves that Mr. Stewart transferred his rights to receive royalties from BMI to Mr. Roberts. This transfer is referred to as an

18

'assignment.' [¶] [Plaintiff] must prove that Mr. Stewart intended to transfer his contract rights to Mr. Roberts. In deciding Mr. Stewart's intent, you should consider the entire transaction and the conduct of the parties to the assignment." Plainly, this instruction treats as contested an issue that BMI admitted was not: whether Stewart had, in the words of his first RFA, "assigned his right to receive future royalties from BMI to Ken Roberts . . . and/or [Roberts Enterprises, Inc] in a document entitled Irrevocable 'Assignment of Monies'" in 1976.[5]

The trial court's apparent rationale for concluding the admissions were not entitled to conclusive effect, which BMI defends on appeal, is that the admissions were not made between the parties at trial, i.e., between plaintiff and BMI. This argument fails. Any party to a pending action may generally use another party's RFA responses against that party, no matter who propounded the RFAs. (*Swedberg v. Christiana Community Builders* (1985) 175 Cal.App.3d 138, 143-144.) "In limiting an admission to the 'pending action only' and to no other action (§ 2033, subd. (c)) the Legislature manifested its intent on the scope of an admission. Had the Legislature intended that admissions not be used by all parties to a single action, the Legislature would have included that limitation in section 2033, subdivision (c). The absence of such a limitation reflects a legislative intent that admissions may be used by all parties to a single action. This is only logical." (*Id*. at p. 144.) Thus, it did not matter whether plaintiff was the party who propounded the RFAs to BMI—she was entitled to have BMI's responses to those RFAs treated as conclusive proof of the points admitted.

---

[5] Although the trial court did also give CACI No. 210, which told the jury to treat facts admitted as proved, that was not enough to avoid error under the circumstances. Earlier, when the RFAs were read to the jury, the court told the jury BMI's admissions should be treated only as a statement of a party opponent. When delivering its final charge to the jury, the court did give CACI No. 210, but it also gave an instruction on statements by a party opponent, CACI No. 212. We have no basis to believe the jury followed the correct admonition in CACI No. 210 rather than the incorrect advice it previously received—indeed, given the conflict, the best we can say is that the jury was necessarily confused about how it should treat responses to RFAs.

BMI's briefs on appeal might also be read to suggest its RFA responses were not binding because trial of plaintiff's breach of contract claim should have been treated as a separate action from the other causes of action in the Fourth Amended Complaint. BMI has not cited any authority treating the trial of a single cause of action in a complaint as an entirely separate action for purposes of RFAs or for discovery generally. True, a complaint and a cross-complaint are deemed separate actions in many contexts, including for purposes of analyzing the effect to be given an admission made therein. (*Shepard*, *supra*, 31 Cal.3d at pp. 259-260.) But the RFAs in question were propounded in this action, not the cross-action, and Stewart's use of the descriptive phrase "as stated in [the] cross-complaint" in each of the RFAs in question does not change that fact.

Instructing the jury with CACI No. 326, which was predicated on the failure to treat the assignment of royalties from Stewart to Roberts as a matter conclusively proven, was error.[6]

B.     *The Failure to Treat the Matters BMI Admitted in its RFA Responses as Conclusively Proven Warrants Reversal*

Article 6, section 13, of the California Constitution prevents us from setting aside a judgment or granting a new trial "on the ground of misdirection of the jury, or of the

---

[6]     Because we reverse on the ground the trial court erred in instructing the jury on contested assignments, we need not reach plaintiff's contention the court erred in denying her new trial motion. We likewise need not reach her claim that the court should have given her requested special instructions, but we briefly explain why the instructions were correctly refused to avoid disputes on remand.

The special instructions plaintiff sought were modeled on language in our prior 2013 opinion in case number B236286. She argues our prior opinion was "law of the case" such that it was the trial court's duty to give the requested instructions. However, as we explained in that opinion, for purposes of reviewing a ruling granting a demurrer, we merely "'"*assume[d]* that the complaint's properly pleaded material allegations are true."' (*People ex rel Lungren v. Superior Court* (1996) 14 Cal.4th 294, 300-301.)" (Opn. at p. 13, emphasis added.) The trial court correctly concluded our opinion was not "law of the case," and the opinion did not entitle plaintiff to an instruction on the theory that the matters discussed therein had been established as facts.

improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." We are of that opinion here.

Plaintiff's theory of liability on the breach of contract claim was straightforward: BMI had a valid contract with Stewart to manage and pay out royalties he earned; Stewart assigned his right to royalties under that contract to Roberts, and BMI accepted the assignment; ergo, Roberts (and plaintiff as his successor-in-interest) had a valid contract with BMI to receive the royalty payments. BMI attacked that theory on several fronts at trial, and one of major lines of attack—if not *the* major line of attack—was its attempt to negate the second premise, i.e., that there was a valid assignment between Stewart and Roberts. The special verdict form reveals the jury found in favor of defendant because it found no contract had been formed between BMI and Roberts.

We have no doubt that on this record, particularly considering the closing argument of counsel, the claim there was no valid assignment was both a point on which BMI heavily relied and the strongest of the points BMI had to offer to claim no contract had been formed. Our Supreme Court's decision in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548 holds "[i]nstructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' [Citation]." (*Id.* at p. 580.) Here, it "seems probable" the error in giving CACI No. 326 (because BMI's admissions were not given conclusive effect) prejudicially affected the jury's verdict that no contract had been formed between BMI and Roberts. In fact, "seems probable" is probably an understatement.

We do not believe BMI presents a valid argument to the contrary. To the extent BMI would claim there was a full and fair presentation of evidence at trial such that the jury's verdict demonstrates there was no miscarriage of justice here (see, e.g., *South Bay Chevrolet v. General Motors Acceptance Corp.* (1999) 72 Cal.App.4th 861, 907-908), we would reject the argument. The key evidence on which BMI relied to argue there had

21

been no valid assignment, and thus no valid contract formed, was Stewart's deposition testimony, e.g., his statements that he did not intend to give Roberts all of his royalties and that he did not even recall signing the 1976 Assignment. That testimony, however, was inadmissible.

A party who asks another party to admit a point may not later make an about face and contradict the very point conclusively established when asking the other party to admit it. *Barsegian v. Kessler & Kessler* (2013) 215 Cal.App.4th 446 explains that judicial admissions, which include matters admitted in response to requests for admission, are "conclusive both as to the admitting party and *as to that party's opponent*." (*Id.* at p. 452 (emphasis in original).) Thus, as the *Barsegian* court explains, "if a factual allegation is treated as a judicial admission, then neither party may attempt to contradict it—the admitted fact is effectively conceded *by both sides*." (*Barsegian v. Kessler & Kessler*, *supra*, 215 Cal.App.4th at p. 452 (emphasis in original); see also *Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 978-979; *Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 746 ["Judicial admissions may be made in a pleading, by stipulation during trial, or by response to request for admission"]; *Murillo v. Superior Court*, *supra*, 143 Cal.App.4th at p. 736 [citing *Scalf v. D.B. Log Homes, Inc.* (2005) 128 Cal.App.4th 1510, 1522]; 4 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 454, p. 587; Weil et al., Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Guide 2015) ¶ 8:1388, pp. 8G29-8G30 ["Admissions in response to RFAs are treated in effect as *stipulations* to the truthfulness of the matters admitted. Therefore, no other evidence is necessary to establish the point at trial and *no contrary evidence is admissible unless leave of court is obtained to withdraw or amend the response*"] (first emphasis added).) Here, Stewart asked BMI to admit he assigned his contractual right to royalties to Roberts, and with the point having been admitted, Stewart was equally bound by it—the matter was conclusively established between the two. Because the admitted fact was *conclusively* binding on Stewart, the party who asked that it be admitted, his contrary testimony offered by BMI was not admissible.

Without Stewart's testimony on the assignment, the remaining evidence at trial would have been wholly insufficient to permit a jury to find Stewart had not assigned his rights to Roberts. There was the testimony of Hirschkowitz and Celestin, but their testimony was ancillary at best on the issue of contract formation; neither testified to any knowledge of whether Stewart signed the Assignment Documents nor any percipient knowledge of the communications between the two men at the time the assignment was alleged to have occurred. There were also the e-mails from Roberts admitted into evidence, but they too would be insufficient—indeed, in one of the e-mails, Roberts in fact references the "assignment given to me by [Stewart] over 20 years ago." The jury's verdict itself therefore provides no basis to conclude a miscarriage of justice has not occurred. Trial should have proceeded on the understanding, indeed, on the admission, Stewart assigned his rights to Roberts.

The error here was of the prejudicial sort that requires a new trial. Upon retrial, BMI's responses to Stewart's RFAs should be given conclusive effect. BMI remains entitled to assert its defenses to liability not inconsistent with its admissions, including its affirmative defense of waiver.

### C. Consolidated Appeal After Ruling on Demurrer

Plaintiff contends the trial court erred in granting BMI's demurrer to a complaint she filed against BMI seeking to recover royalties BMI paid to Stewart's attorneys after January 2010. The trial court found the complaint was the product of impermissible claim splitting, and we hold that determination was correct.

#### 1. Procedural history

Shortly before trial began in case number BC430809 on which we have thus far focused our attention (the First Action), plaintiff filed another complaint against BMI in case number BC553094. This complaint contained three causes of action: breach of contract, negligence, and declaratory relief. Broadly stated, plaintiff alleged BMI

23

breached the Assignment Documents by paying Stewart's royalties to his attorneys (the Allen Law Group, or ALG) rather than to plaintiff. Whereas the complaint in the First Action sought to recover royalties paid during the period from 1996 to 2009, the new complaint sought a declaration that BMI was required to pay her all of Stewart's royalties in perpetuity, i.e., from January 2010 forward. This January 2010 timeframe coincided with the date the original complaint was filed in the First Action. It also coincided with the date of a declaration signed by Roberts disclaiming any further right to Stewart's royalties and directing BMI to pay those royalties to Stewart's attorneys.[7] The trial court granted BMI's demurrer to this new complaint with leave to amend.

On January 2, 2015, plaintiff filed a first amended complaint (the 2010-Forward Complaint) that was largely the same as the first version of the new complaint but contained only two causes of action, for breach of contract and breach of the implied covenant of good faith and fair dealing. Paragraphs 1 through 28 of the 2010-Forward Complaint allege facts virtually identical to the background facts alleged in the First Action. Beginning in paragraph 29, plaintiff turns her attention to Stewart's 2009 investigation of his BMI royalties, and his contact with Roberts on this topic. Plaintiff alleges, in pertinent part, that Stewart's lawyer prepared in 2010 a declaration for Roberts that stated Stewart's assignment to Roberts was collateral for a loan since repaid, the royalties rights had reverted to Stewart, and BMI should pay the royalties to Stewart's law firm. Plaintiff also alleges the declaration was faxed to Roberts, who was in the hospital on heavy medication for what turned out to be acute kidney failure, and that he signed the declaration without reading it.

The first cause of action in the 2010-Forward Complaint for breach of contract alleges Roberts and BMI entered into two written contracts, first the 1976 Assignment

---

[7]     By limiting her damages in the First Action only to payments BMI made *before* January 2010 and seeking damages *after* January 2010 in a separate complaint, plaintiff successfully sought to exclude any references to Roberts' January 2010 declaration at trial of the First Action.

and then the 1979 Direction. It further alleges: "Under the terms of these contracts, BMI was obligated to pay the BMI Royalties to Roberts or his designee in perpetuity. [¶] 65. Roberts had, and Pope has, performed all of their duties under these contracts, except as excused by BMI's material breaches. [¶] 66. BMI breached these contracts by paying $666,112.20 in BMI Royalties to ALG and not Roberts or his designee." Copies of the two "written documents" were attached to the complaint as Exhibits B and C.

The second cause of action in the 2010-Forward Complaint, for breach of the implied covenant of good faith and fair dealing, alleges "BMI breached the implied covenant of good faith and fair dealing in said contracts [the Assignment Documents] by paying $666,112.20 in BMI Royalties to ALG and not Roberts or his designee."

BMI demurred to the 2010-Forward Complaint, arguing the causes of action were based on the same harm asserted in the first action—BMI's failure to pay money to plaintiff under the Assignment Documents—and so constituted impermissible claim splitting. Accepting that argument, the trial court sustained the demurrer without leave to amend.

### 2. *The trial court correctly sustained BMI's demurrer arguing impermissible claim splitting*

"The law abhors a multiplicity of actions." (*Flickinger v. Swedlow Engineering Co.* (1955) 45 Cal.2d 388, 393 (*Flickinger*).) Thus, California long ago adopted the primary right theory of code pleading. (*Crowley v. Katleman* (1994) 8 Cal.4th 666, 681 (*Crowley*).) This theory "provides that a 'cause of action' is comprised of a 'primary right' of the plaintiff, a corresponding 'primary duty' of the defendant, and a wrongful act by the defendant constituting a breach of that duty. [Citation.] The most salient characteristic of a primary right is that it is indivisible: the violation of a single primary right gives rise to but a single cause of action. [Citation.] A pleading that states the violation of one primary right in two causes of action contravenes the rule against 'splitting' a cause of action." (*Ibid*.)

25

Thus, under the primary right theory, "a party cannot by negligence or design withhold issues and litigate them in successive actions; he may not split his demands or defenses; he may not submit his case in piecemeal fashion. (*Brunswick Drug Co. v. Springer* [(1942)] 55 Cal.App.2d 444, 449-450.) If by an attempt at artful pleading a party could assert his cause in one form in one action, and after an adverse decision on the merits, reassert it in another form in a subsequent action, there would be no end to litigation." (*Flickinger*, *supra*, 45 Cal.2d at p. 393.)

BMI argues that plaintiff filed the 2010-Forward Complaint as a strategic matter, to prevent the jury in the first action from learning of the existence of the 2010 Roberts declaration. Plaintiff, on the other hand, implies that she was unaware of the contents of the declaration, which Roberts signed while in the hospital, until 2013. Plaintiff's knowledge of the declaration is immaterial. "[A] party cannot by negligence or design withhold issues and litigate them in successive actions." (*Flickinger, supra*, 45 Cal.2d at p. 393.) The determinative question is whether plaintiff had one primary right she sought to vindicate or two. We hold that she had only one such right.

In the complaint in the first action, plaintiff alleged BMI breached Assignment Documents by paying Stewart's royalties to someone other than Roberts, specifically the Goldstein defendants. In the 2010-Forward Complaint in the second action, plaintiff alleged that BMI breached the Assignment Documents by paying Stewart's royalties to someone other than Roberts, specifically Stewart's attorneys. Plaintiff attached copies of the Assignment Documents to both the complaint in the first action and the 2010-Forward Complaint. Thus, the two actions involve the same two parties, the same two agreements, and the same alleged breach of those agreements by BMI. The only difference between the two actions is the identity of the party to whom BMI wrongfully paid Stewart's royalties.

A plaintiff's "primary right is simply the plaintiff's right to be free from the particular injury suffered. [Citation.]" (*Crowley*, *supra*, 8 Cal.4th at p. 681.) Plaintiff's own allegations show that BMI had one "primary duty" in both cases: to pay Stewart's

26

royalties to her. The wrongful act by which BMI allegedly breached that duty in both cases was its failure to pay the royalties to her, as Roberts's successor. Plaintiff's injury in both cases was the non-payment to her of Stewart's royalties. Thus, plaintiff's "primary right" in both cases was the right to receive Stewart's royalties from BMI.

Plaintiff claims, however, that the primary right doctrine does not apply because her two actions involve different facts. She asserts the 2010-Forward Complaint contains allegations about the 2010 Roberts declaration which are not alleged in the first action. But this argument views the facts from the wrong perspective, and too narrowly. Both of the lawsuits she pursues allege BMI had an obligation to pay Stewart's royalties to her, beginning in 1976 and continuing until the present. Her harm is the same whether BMI paid Stewart's royalties to the Goldstein defendants, Stewart's attorneys, or random visitors to BMI's offices.

Instead, BMI's actual disposition of the royalties is simply part of BMI's defense to plaintiff's claim that BMI breached its duty to her. BMI defended its non-payments from 1996 to 2009 by asserting that Roberts (and therefore plaintiff) had waived his claim to those payments by inaction when BMI was sending the royalties to the Goldstein defendants. BMI defended its non-payments in 2010 and beyond by claiming that Roberts directed BMI to pay the royalties to Stewart's attorneys. That BMI may have differing defenses for the alleged ongoing breach, however, does not mean plaintiff has two separate primary rights. We conclude to the contrary, and affirm the judgment of dismissal for that reason.

DISPOSITION

The judgment in case number BC430809 is reversed and the case is remanded for a new trial.  The judgment in case number BC553094 is affirmed.  The parties shall bear their own costs on appeal.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, J.


I concur:


TURNER, P.J.

28

RAPHAEL, J., concurring.

I join the opinion and its result, with one exception. I would not reach the issue, addressed in part II.B of the opinion, of whether Sylvester Stewart's deposition testimony would be inadmissible if offered by BMI absent BMI's judicial admissions in this case. Apart from this matter, and consistent with part II.B of the opinion, I would find that the error in failing to treat the matters BMI admitted as conclusively proven is reversible because, had BMI been held to its judicial admissions, "it is reasonably probable that the jury would have reached a different result." (*Monroy v. City of Los Angeles* (2008) 164 Cal.App.4th 248, 261; see *Valerio v. Andrew Youngquist Construction* (2002) 103 Cal.App.4th 1264, 1273-1274).

RAPHAEL, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.